ALEXANDER & ALEXANDER SERVICES, INC. and Alexander & Alexander, Inc., Plaintiffs–Appellants,

v.

THESE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, England, Subscribing to Insurance Evidenced by Policy Nos. 879/P.31356 and 879/P.35349, and Assicurazioni Generali S.P.A., Defendants–Appellees.

No. 77, Docket 96–9535.

United States Court of Appeals, Second Circuit.

Argued Aug. 25, 1997.

Decided Jan. 23, 1998.

---

James A. Shanman, New York City (Sharfman, Siviglia, Poret, Kook, Ross & Shanman, New York City, on the brief), for Plaintiffs–Appellants.

Lawrence Mentz, White Plains, New York (Peter Hoenig, Elissa Berkman, Biedermann, Hoenig, Massamillo & Ruff, New York City, on the brief), for Defendants–Appellees.

Before: KEARSE, MCLAUGHLIN, Circuit Judges and GODBOLD [1] Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

This case involves a dispute over insurance coverage. The policy in dispute is an errors and omissions (E & O) policy that promises to provide reimbursement for losses and legal expenses incurred by the insured when it is sued by third parties who claim that the insured or its employees have harmed them. The plaintiffs, Alexander & Alexander Services and Alexander & Alexander, Inc. (A & A), an insurance brokerage conglomerate, brought a declaratory judgment action in New York state court seeking a determination that the losses and expenses it incurred in defending and settling an action brought against it in Pennsylvania by the rehabilitator of a Pennsylvania insurance company, Mutual Fire, Marine and Inland Insurance Company (Mutual Fire), were covered under an E & O policy issued by the defendants, These Certain Underwriters at Lloyd's, London (Lloyd's). Lloyd's denied coverage. The present case was brought in New York state court and was removed to the United States District Court, S.D.N.Y. Both parties moved for summary judgment. The district court denied A & A's motion and granted summary judgment to Lloyd's. We reverse and remand.

The central issue concerns the meaning of Exclusion E of the policy. The coverage provision of the policy reads: "[T]his Insurance . . ., indemnifies the Assured against any claim for breach of professional duty by the Assured, or any person or entity for which the Assured is legally liable, . . . by reason of any negligent act, error or omission or the fraud or dishonesty of its employees."

Exclusion E provides that there shall be no liability for "any claim arising from the financial inability to pay of any insurer or reinsurer with which the Assured has placed or obtained coverage for a client or an account."

The district court held that the policy did not cover losses incurred from intentional conduct, but it found that much of the conduct alleged to have given rise to coverage arguably fell within the coverage language for alleged negligent acts, errors or omissions. The court concluded, however, that it was unnecessary to address the scope of coverage because it found that Exclusion E unambiguously excluded all relevant coverage. This conclusion is the subject matter of this appeal.

I. Factual Background

A & A, which engages in insurance brokerage and risk management, contracted with Lloyd's to acquire two E & O policies. The first, number P.31356, was effective from December 1, 1985 through November 30, 1986. The second, P. 35349, was effective from December 1, 1987 through November 30, 1988. The parties agree that only one policy applies to A & A's claims and that identification of the appropriate policy depends upon a determination of when a claim was made. Because the language of the relevant clauses is the same in both policies, a determination of which policy applies is not necessary. For simplicity, at times we refer to the policies in the singular.

The policy was the result of extensive negotiations between the parties concerning scope of coverage and appropriate premiums. A & A retained Michael S. Monkland to act as its "Lloyd's broker." Monkland negotiated with Richard E. Thomson, the active underwriter of a Lloyd's syndicate. Both Thomson and Monkland were experienced and knowledgeable in the field of E & O policies insuring brokers. They renewed their negotiations throughout the years when the A & A policy was subject to renewal.[2]

---

**1.** The Honorable John C. Godbold of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

**2.** Lloyd's operates as a marketplace for the placement of insurance. Syndicates made up of individual underwriters insure risks on behalf of their members. Normally, several syndicates will provide insurance for a given risk by agreeing to cover a percentage of that risk. To obtain insurance from Lloyd's a party must acquire a "Lloyd's broker" to approach this market of syndicates and negotiate with a leading underwriter for one of the syndicates. The underwriter is typically a specialist in the particular type of risk for which insurance is sought, and the members

Exclusion E is one item of a list of specific exclusions presenting circumstances for which coverage will be denied.

## II. The Pennsylvania Action

During the 1970's and 1980's A & A's wholly owned subsidiary, Shand, Morahan & Company ("Shand"), contracted with and performed underwriting services for Mutual Fire. It performed basic management services for Mutual Fire including accepting or declining applications for insurance, issuing policies, collecting premiums, handling claims, and obtaining reinsurance, all on behalf of Mutual Fire. Because Shand is a wholly owned subsidiary of A & A, and claims asserted against the two entities treat them as alter egos, we treat them as a single entity and refer to the entity by either name.

During the mid–1980's Mutual Fire began experiencing financial difficulties, and on December 8, 1986, the Commonwealth Court of Pennsylvania issued an order of rehabilitation naming the Pennsylvania Insurance Commissioner as rehabilitator for Mutual Fire. The rehabilitator brought an action in the Commonwealth Court against A & A and Shand (the Pennsylvania action). The rehabilitator's complaint, on theories of agency and alter ego, sought to hold Shand and A & A liable upon various claims, alleging negligence, breach of contract, and breach of fiduciary duty in connection with professional services performed on behalf of Mutual Fire. The complaint also alleged against A & A alone claims for negligence, tortious interference with contract, and unjust enrichment.

The rehabilitator sought to recover from A & A nearly $235,000,000. The district court described the complaint as embracing eight failures to act:

(1) Failure to properly manage claims on Mutual Fire business;

(2) Failure to provide adequate information on Mutual Fire business;

(3) Failure to properly select reinsurers and to collect funds due from them on Mutual Fire business;

(4) Failure to properly select and supervise defense counsel for claims made on Mutual Fire policies;

(5) Failure to comply with applicable laws and regulations;

(6) Failure to operate in Mutual Fire's best interest, instead favoring themselves and other companies;

(7) Failure to develop appropriate underwriting procedures with respect to Mutual Fire business;

(8) Failure to set, modify, or collect premiums on Mutual Fire business.

The rehabilitator and A & A entered into a settlement agreement in the Pennsylvania suit whereby A & A agreed to pay a total of $47,000,000 to the rehabilitator over six years. The settlement included parties other than A & A, and it did not allocate the settlement amount to particular claims made in the rehabilitator's complaint.

## III. The Current Dispute

After settling the rehabilitator's action in the Pennsylvania court A & A requested indemnification from Lloyd's to the extent of the applicable policy limits for its losses and legal expenses in defending the Pennsylvania action. Each E & O policy provides primary insurance in the aggregate amount of $10 million less specified deductibles. A & A claims that in the Pennsylvania suit it incurred over $21 million in defense costs alone.

Lloyd's unequivocally denied coverage, and A & A commenced this suit for declaratory judgment, asking the court to declare its right to reimbursement under the E & O policies. After extensive discovery both parties moved for summary judgment. The district court granted summary judgment in favor of Lloyd's, holding that coverage under the policies was precluded by Exclusion E. The court declined to rule on whether A & A's claim was within the scope of coverage of the policies. Instead it declared that even if the claim was the type of claim covered under the policies, the language of Exclusion

of the various syndicates will generally trust this underwriter's judgment in negotiating the policy

language on behalf of all of the syndicates.

E plainly and unambiguously excluded coverage for reimbursement of expenses and costs incurred in defending the action brought by the rehabilitator against A & A. A & A appealed.

## IV. Discussion

We examine the summary judgment in favor of Lloyd's under a de novo standard of review. *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993). Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. Proc. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Under New York law "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assoc., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996) (quoting *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996)). Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous. *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990); *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). An ambiguity exists where the terms of a contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997). Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language. Hence, "only

where the language *and* the inferences to be drawn from it are unambiguous" may a district court "construe a contract as a matter of law and grant summary judgment accordingly." *Cable Science,* 920 F.2d at 151.

If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence. If the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract. *Seiden Associates v. ANC Holdings, Inc.,* 959 F.2d 425, 428–29 (2d Cir.1992). If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist. If the language is susceptible to different reasonable interpretations, and "where there is relevant extrinsic evidence of the parties' actual intent," then the contract's meaning becomes an issue of fact precluding summary judgment. *Seiden Associates,* 959 F.2d at 428. Consequently, only where the court finds that the terms are unambiguous, or where no extrinsic evidence exists, may it properly grant summary judgment to one of the parties. *Seiden Associates,* 959 F.2d at 428 ("Where the language used is susceptible to differing interpretations ... and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become[s] an issue of fact and summary judgment is inappropriate.").

Three discrete but related inquiries run through this case. First, what is "coverage placed or obtained?" Second, who is a "client or account?" Third, once one identifies the first two inquiries, must there be a relationship between coverage and the claim or claims asserted by the rehabilitator in the Pennsylvania case?

(A) What is "coverage placed or obtained?"

A & A asserts that more than half of the total amount of the rehabilitator's claims arose from business that had nothing to do with Shand, i.e., Shand did not "produce," "obtain," or "place" it. A & A says that Shand

was only one of a large number of managing general agents who performed underwriting functions for Mutual Fire, and indeed that only an average of approximately 16% of Mutual Fire's business was underwritten by Shand. Additionally, it asserts that a substantial part of business underwritten by Shand for Mutual Fire did not originate from Shand but rather was produced by a large number of insurance brokers, i.e., Shand may have "placed" the coverage in question but it was "produced" by the broker, and "cover-age" means "Shand-produced." The district court did not squarely address the issue of business produced by other managing general agents. With respect to business originating or produced by independent brokers and placed by A & A, the district court held that these independent brokers were "clients" of A & A for whom A & A "placed" coverage with other clients.

### (B) Who is a "client or account"

A & A contends that policyholders whose business originated with independent brokers and for whom A & A placed Mutual Fire policies were clients of the brokers and not of A & A.

The court turned to the dictionary for the meaning of "clients" and adopted the dictionary definition that "client" means "one for whom professional services are rendered." It held that Shand performed services on behalf of Mutual Fire, of insurance brokers who engaged Shand, and of policyholders holding Mutual Fire policies, and that A & A was not limited to one client per transaction. Therefore, each of these individuals or entities was a "client" of Shand. Thus, the district court swept into Exclusion E all participants in the same transaction.

A & A asserts that "client or account" refers to only its actual brokerage clients, not to all insureds for whom it wrote Mutual Fire policies. According to A & A, a substantial majority of the policyholders whose policies were underwritten for Mutual Fire by Shand were clients of other brokers. A & A brokerage clients accounted, on average, for only 22% of the premiums on policies underwritten by Shand for Mutual Fire. But according to Lloyd's, and as found by the district court, all policies of Mutual Fire produced or underwritten by Shand were necessarily accounts of Shand.

The district court did not make the requisite inquiry needed to determine whether ambiguity existed. Dictionary definitions are not determinative of the meaning of "client or account." The district court did not consider the meaning of the terms of Exclusion E with respect to customs or terminology generally understood in the insurance brokerage trade. The terms of a contract suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot*, 110 F.3d at 906. The uncertainty of what "client" means is revealed in oral argument to this court.[3]

Because more than one meaning for "client or account" appears reasonable, the term is ambiguous.

### (C) Is a relationship required between coverage and claim?

Whether there must be a relationship between coverage written or placed by A & A

---

3. **Counsel for Lloyd's:** [So in this case] client means a lot more than just brokerage clients of Alexander & Alexander or brokerage clients of Shand Morahan. In fact the affidavit submitted by the Senior Vice president and General Counsel of Shand Morahan specifically says that more than 20% ... of the business underwritten by Shand Morahan were [sic] brokerage clients of the plaintiffs in this case Alexander & Alexander.

    **Judge Godbold:** Do these meanings that you attribute to client appear on the face of the document, or is the term client an ambiguous term?

    **Counsel for Lloyd's:** In this context, Your Honor, I would not call client an ambiguous

term ... I believe it is not an ambiguous term. Judge Mckenna thought it was unambiguous. Both parties have argued that it is unambiguous. We do differ as to what its meaning is, but we all agree it is unambiguous. Just to get back to the point Your Honor, *there can be more than one meaning to client in this context.* Beyond that there's no doubt that all of the business underwritten by Shand were accounts of Shand. If you look at the affidavit of Senior Vice president and General Counsel of Shand Morahan you will see that no where does he say that business was not accounts of Shand. ...

and a claim or claims asserted by the rehabilitator in the Pennsylvania case is central to this case. Before the district court Lloyd's espoused that Exclusion E unambiguously negated coverage for all claims arising from the insolvency of an insurance or reinsurance company. A & A contended that the exclusion only applied to situations where claims were brought by a client or an account of A & A which alleged that A & A negligently obtained insurance or reinsurance coverage for it from a company that was not financially sound, i.e., the exclusion only applies to reinsurance covering Mutual Fire that A & A has obtained or produced or underwritten for Mutual Fire.[4] Apart from this acknowledged area of responsibility, A & A contends that the exclusion is operative where there is a claim asserted in the Pennsylvania case and an inability to pay arises from insolvency, but only to the extent that a relationship or nexus exists between the claim and coverage placed or obtained by A & A.

For its part, Lloyd's position is plenary—a claim asserted by the rehabilitator need not be related to business obtained, produced, written or underwritten by Shand. The breadth of Lloyd's contention is seen in its brief, p. 14:

> Exclusion E operates to bar coverage for all of the Rehabilitator's claims for Shand's or A & A's failures, even if such failures might have resulted in damage claims with the respect to business not obtained, produced, written or underwritten by Shand.

And, at p. 15:

> [T]here may be Mutual Fire policyholders that were "clients" of Shand or A & A whose business was underwritten by others for Mutual Fire. To the extent the Rehabilitator's claims derived from such policyholders, those claims also come within the literal language of Exclusion E.

In short, for Lloyd's it is enough that in fact Mutual Fire became insolvent and is unable to pay a claim or claims and in fact some coverage was placed or obtained by A & A though unrelated to the claim; there need be no relationship or nexus. Thus Lloyd's sweeps within Exclusion E all rehabilitator-asserted claims related to business underwritten, produced or obtained by Shand, plus all claims that A & A mismanaged Mutual Fire's affairs, violated fiduciary responsibilities, and negligently handled its business. Note that in the district court's paraphrased list of the actions alleged in the rehabilitator's complaint, set out above, item (5), failure to comply with applicable laws and regulations, and item (6), failure to operate in Mutual Fire's best interest and instead favoring themselves and other companies, do not purport on their faces to relate in any direct sense to business produced or managed by A & A or Shand.

### (D) The District Court's test

The district court, in effect, adopted Lloyd's position. As the beginning point of its analysis, it interpreted Exclusion E to impose two conditions upon its application. The first condition was that a claim must arise from the financial inability to pay of any insurer or reinsurer. This condition was met, the court held, because the rehabilitator would not have been appointed and thus no claim would have been brought but for Mutual Fire's insolvency. The second condition was that A & A, through Shand, must have placed some coverage with Mutual Fire, the insolvent insurer, on behalf of a client or account. It required no relationship or nexus between any claim or claims and business placed. All that it required was the fact that Mutual Fire's insolvency made it unable to pay and the fact that A & A had placed some coverage with Mutual Fire. As A & A points out, this plenary exclusion will operate based upon a possibly fortuitous circumstance of whether A & A, one of the largest insurance brokers in the world, at any time during the life of the E & O policy had placed any coverage with the insolvent insurer. It may

---

4. A & A concedes that insofar as it placed reinsurance coverage for Mutual Fire with an insolvent reinsurer, Mutual Fire is a client of A & A therefore a claim such as this would be properly excluded by Exclusion E. Furthermore, A & A asserts that such a claim is precisely the type— and the only type—of claim that Exclusion E was meant to exclude. A & A's concession is limited, however, to placing insurance with an insolvent reinsurer. This concession does not make Mutual Fire a client of A & A for the purposes of determining whether Exclusion E excludes other types of claims brought by the rehabilitator.

appear to a reasonably intelligent person that the second condition in the district court's threshold analysis is not to be read independently but is a limitation on the first, that is, there must be both an asserted claim and an inability to pay that arises from insolvency but only to the extent a relationship or nexus exists between the claim and coverage placed or obtained by A & A.

## V. Summarizing

Summarizing, Exclusion E is fraught with ambiguities. We are uncertain of the meaning of "coverage placed or obtained;" uncertain of the meaning of "client or account," and uncertain whether there must be a relationship or nexus between a claim asserted in the Pennsylvania case and not paid because of insolvency and coverage placed or obtained or underwritten by A & A. The district court erred in granting summary judgment to Lloyd's on the ground that Exclusion E unambiguously excluded all relevant coverage. And the court erred in not inquiring into the meaning of Exclusion E viewed objectively by a reasonable person who has examined it in context, cognizant of the customs, practices, usage and terminology of the particular trade or business.

REVERSED and REMANDED.